UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

                           Plaintiff(s),

                  -against-

NEUROTECH DEVELOPMENT CORP.
BERNARD ARTZ, and LAWRENCE ARTZ,

                          Defendant(s).
----------------------------------------------------------X

**REPORT AND RECOMMENDATION**

CV 04-4667 (TCP) (WDW)

**WILLIAM D. WALL, United States Magistrate Judge:**

      Before me on referral from Judge Platt is plaintiff's motion requesting remedies. Docket Entry ("DE") [63]. For the reasons set forth herein, it is recommended that plaintiff's motion for remedies of disgorgement, prejudgment interest, and civil penalties be granted as follows: as to defendant Bernard Artz – disgorgement of proceeds in the amount of $131,414.00, prejudgment interest of $32,017.42, plus any additional interest accrued to the date of entry of judgment, and a civil penalty in the amount of $10,000.00; as to defendant Lawrence Artz – disgorgement of proceeds in the amount of $57,129.73, prejudgment interest of $79,846.92, plus any additional interest accrued to the date of entry of judgment, and a civil penalty in the amount of $5,000.00.

## BACKGROUND

      This action was commenced by the plaintiff Securities and Exchange Commission (the "SEC") against defendant Neurotech Development Corporation ("Neurotech") and its sole officers, Chairman/CEO/CFO Bernard Artz and his son, Vice President Lawrence Artz. According to the complaint, during the period of time from May 1999 through January 2003, defendants made false and misleading statements concerning Neurotech's purported receipt of

"bank guarantees" from Indonesia worth millions of dollars, as well as hospital construction contracts worth billions of dollars. Compl. ¶1, DE [1]. These statements were made in SEC filings and press releases and were signed by both Bernard Artz and Lawrence Artz. *Id.* at ¶2. The statements and filings "falsely suggested that Neurotech was an active, viable company with an imminent revenue stream." *Id.* at ¶26. Between October 1999 and April 2002, defendants issued thirteen press releases containing false and misleading statements. *Id.* at ¶¶27-33. From January 2000 through May 2002, Neurotech made similar misrepresentations in six filings with the SEC. *Id.* at ¶34.

The procedural events of the litigation are not relevant to this motion. Suffice it to say that eventually, the parties entered into a series of Settlement Agreements or Consent Decrees, *see* DE [57-59], and Final Judgments, *see* DE [60-62]. Under the terms of these agreements, both defendants are permanently enjoined from violating various securities laws, barred from serving as an officer or director for five years, and barred from participating in any offering of penny stock for five years. The Consent Decrees further provide, *inter alia,* that the court would, upon the SEC's motion, order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty, in an amount to be determined by the court. The SEC filed its fully briefed motion for civil penalty and disgorgement that is the subject of the within referral. *See* Motion, DE [63]. In that motion, the SEC seeks an order:

1. requiring Lawrence Artz to disgorge the full amount of his $57,129.73 in ill-gotten gains, with prejudgment interest of $32,017.42, for a total of $89,147.15;

2. requiring Lawrence Artz to pay a civil penalty of $120,000;

3. requiring Bernard Artz to disgorge the full amount of his $131,414.00 in ill-gotten gains, with prejudgment interest of $79,846.92, for a total of $211,260.92; and

4. requiring Bernard Artz to pay a civil penalty of $120,000.

That motion was been referred to me by Judge Platt to report and recommend on "the amounts of disgorgement of ill-gotten gains, if any, are owed by defendants Bernard and Lawrence Artz and as to whether defendants should pay civil penalties and in what amounts." DE [64]. Based on the terms of the Consents and Final Judgments executed by the parties, the defendants may not argue that they did not violate federal securities law, and the allegations in the complaint are deemed to be true. Final Judgments, ¶VII, DE [60], ¶VI, DE [61] .

## DISCUSSION

### A. Disgorgement of Ill-Gotten Gains

Disgorgement is an equitable remedy designed to "forc[e] a defendant to give up the amount by which he was unjustly enriched" as a result of his violations of federal securities laws. *S.E.C. v. Tome,* 833 F.2d 1086, 1096 (2d Cir. 1987); (*quoting S.E.C. v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 102 (2d Cir. 1978)). "The purpose of disgorgement is to deprive the wrongdoer of his unjust enrichment and to deter others from violating the securities law." *S.E.C. v. Inorganic Recycling Corp.,* 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002). The main determinant in setting the amount of disgorgement to be ordered is "the amount of gain received by each defendant from the fraud." *Id*. Plaintiff need only establish that the amount of disgorgement is "a reasonable approximation of profits causally connected to the violation." *S.E.C. v. Warde,* 151 F.3d 42, 50 (2d Cir. 1998) (*quoting S.E.C. v. Patel,* 61 F.3d 137, 139 (2d Cir. 1995)). "After a plaintiff makes a showing of the amount properly to be disgorged, the burden then shifts to the defendant who must clearly demonstrate that the amount claimed by the

plaintiff is not a reasonable approximation." *S.E.C. v. Anticevic,* 2010 WL 2077196, at *6 (S.D.N.Y. May 14, 2010) (citation omitted); *see also S.E.C. v. Opulentica, LLC,* 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (noting that while the SEC "bears the ultimate burden of persuasion," upon its making a reasonable showing, the burden shifts to the defendant). This court "is entitled to broad discretion in calculating the amount of ill-gotten gains to be returned." *S.E.C. v. Shehyn,* 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010); *see also S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474-75 (2d Cir. 1996) (the court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged").

Here, the SEC seeks to disgorge the amount of profit each defendant realized upon the sale of shares in 2001 and 2002.[1] The SEC has provided documentation that, during the period of May 2001 through November 2002, Bernard Artz sold 842,220 shares of Neurotech common stock for a gain of $131,414, and Lawrence Artz realized $57,129.73 on his sale of 1,092,000 shares. *See* London Decl., Pl's Ex. B at ¶¶3, 5. Neither defendant has contested the amount of disgorgement sought by the SEC or even suggested that the amount is not a reasonable approximation of their ill-gotten gains. They simply state that the proceeds from their sale of the stock "went into running the business. Neither of the Individual Defendants gained personally from their sale of the stock." Defs. Mem. at 3. Defendants have completely failed to support this argument, either with evidence indicating that the proceeds from the sales were actually put back into the business, or with legal authority suggesting that disgorgement would be inappropriate in

---

[1]The SEC notes that it seeks only disgorgement of proceeds from the defendants' actual sales of Neurotech stock and not stock, options, and unpaid salaries that defendants' also received during the relevant time period. *See* Pl. Mem. at 5 n.3.

such a situation.

The remainder of defendants arguments are based upon their negative net worth, and their purported inability to find meaningful work, as well as emotional appeals based upon Bernard Artz's status as a disabled World War II veteran and Lawrence Artz's bad health. Their current financial positions do not mandate a finding that disgorgement is inappropriate as "[f]inancial hardship does not preclude imposition of an order of disgorgement." *Inorganic Recycling Corp.,* 2002 WL 1968341, at *2; *see also S.E.C. v. Universal Exp., Inc.,* 646 F. Supp. 2d 552, 565 (S.D.N.Y. 2009) ("a court is not bound to consider a defendant's claims of financial hardship"). Similarly, although defendants currently claim to be insolvent, "[t]he fact that swindlers have run through the proceeds of the fraud and are now insolvent should not prevent the imposition of a remedy, since defendants may subsequently acquire the means to satisfy the judgment." *Inorganic Recycling Corp.,* 2002 WL 1968341, at *2 (internal quotation and citation omitted).

Upon my review of the evidence and arguments presented, I find that the SEC has met its burden of reasonable persuasion regarding the amount of disgorgement and that defendants have failed to meaningfully contest the SEC's evidence. Accordingly, I recommend a finding that the court issue a disgorgement order to defendants in the amounts claimed by the SEC.

## B. Prejudgment Interest

In addition to disgorgement, the SEC seeks prejudgment interest on the amount of the disgorgement. Prejudgment interest on the disgorgement may also be awarded "in order to deprive the defendant of the time-value of the money." *Anticevic,* 2010 WL 2077196, at *7 (citation omitted); *see also S.E.C. v. Roor,* 2004 WL 1933578, at *10 (S.D.N.Y. Aug. 30, 2004) ("Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts

to an interest free loan procured as a result of illegal activity"). The interest is calculated by applying the tax underpayment rate set by the Internal Revenue Service. *Id.;* 26 U.S.C. §6621(a)(2). Whether to award prejudgment interest as well as the rate to be applied to such an award are also decisions that lie within the court's discretion. *See First Jersey Sec., Inc.,* 101 F.3d at 1476. "In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." *Id.*

Defendants have presented no argument specifically in opposition to an award of prejudgment interest. As such, and given the remedial purposes of the securities law and my review of the relevant case law, I find an award of prejudgment interest to be appropriate, and recommend an award of the amounts sought by the SEC, at the IRS tax underpayment rate, plus any additional interest accrued to the date of entry of judgment.

## C. Civil Penalties

In addition to disgorgement and prejudgment interest, the SEC seeks civil penalties as well. The Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("Remedies Act"), codified at §21(d)(3)(A) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78u(d)(3)(A), authorizes the SEC to seek civil penalties in addition to disgorgement. "Civil penalties are designed to punish the individual violator and deter future violations of the securities law." *S.E.C. v. Tannenbaum,* 2007 WL 2089326, at *6 (E.D.N.Y. Jul. 19, 2007) (citation omitted); *see also S.E.C. v. Moran,* 944 F. Supp. 286, 296 (S.D.N.Y. 1996) ("By enacting the Penalty Act, Congress sought to achieve the dual goals of punishment of the individual violator and deterrence of future violations").

Courts may impose a civil penalty not to exceed the greater of (1) the gross pecuniary

gain to the defendant as a result of a violation, or (2) a specified amount per violation where the amount depends on whether the violation is "first-tier," "second-tier," or "third-tier." *See* 15 U.S.C. §78u(d)(3)(B). The maximum penalty under the first, second, and third tiers is $6,500, $60,000, and $120,000, respectively, per violation. Third tier penalties are appropriate if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" that "resulted in substantial losses or created a significant risk of substantial losses." 15 U.S.C. §78u(d)(3)(B)(iii).

In determining whether to impose a civil penalty and the amount of the fine, the court should examine "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *S.E.C v. Aragon Capital Mgmt. LLC*, 672 F. Supp. 2d 421, 447 (S.D.N.Y. 2009) (*quoting S.E.C. v. Haligiannis,* 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). The court may also consider "the deterrent effect of a penalty given the defendant's net worth." *Anticevic,* 2010 WL 2077196, at *8 (*citing S.E.C. v. Sekhri,* 2002 WL 31100823, at 18 (S.D.N.Y. Jul. 22, 2002)).

Here, the SEC claims that the penalty should be imposed under the third tier and seek a penalty of $120,000 from each defendant.[2] Defendants argue that third tier penalties are not appropriate since they only made two statements "that were set forth in several forms." The facts

---

[2]The SEC notes that although there is precedent for finding each defendant liable for multiple violations and thus multiple maximum penalties, it is seeking only a single penalty against each defendant. *See* Pl. Mem. at 10, n.6.

do not support defendants' arguments. Although there were, in fact, only two misleading "statements" made by defendants, those misrepresentations were made repeatedly and over an extended period of time. The fact that the violations were recurrent weighs in favor of the imposition of civil penalties.

Defendants also claim that they had no guilty state of mind, and that at most they were guilty of an "overly enthusiastic interpretations of events" also fails.[3] Third tier penalties are appropriate where a defendant makes statements that are "at best misleading and sometimes wholly fantastical." *Universal Exp. Inc.,* 475 F. Supp. 2d at 426-27, 429. Defendants' actions were, at the very least reckless in their failure to confirm the value or authenticity of the purported Indonesian bank guarantees and in their misrepresentations as to the "value" of Neurotech contracts. *See, e.g., S.E.C. v. Solucorp Indus., Ltd.,* 274 F. Supp. 2d 379, 418 (S.D.N.Y. 2003) (finding officers guilty at the very least of reckless disregard for the truth or falsity of press statements and filings regarding contracts that did not exist and for reports "that the minimum revenues to be derived from such contracts far exceeded the actual minimums"). In addition, Neurotech had been sanctioned by the SEC in December 2000 regarding negligent misrepresentation of material facts concerning Turkish "bank guarantees." Compl. ¶8. This fact indicates that defendants should have known that their conduct violated securities law, further supporting a finding that their actions were, at the very least, reckless. The recklessness of defendants' actions clearly favors the imposition of penalties.

---

[3]The SEC notes that defendants are precluded by the terms of the Consent Decrees and Final Judgements from arguing that they did not violate federal securities law. As defendants are presenting their arguments regarding scienter in connection with the appropriate tier of civil penalty to be imposed, I will consider their arguments to that limited extent.

Another factor in determining whether to impose civil penalties and the amount of that sanction is the extent to which defendants' conduct created substantial losses by other persons. According to the SEC, Neurotech's filing for the fiscal year ending June 30, 2002 disclosed that there were 156,139,680 shares of common stock held by non-affiliates with a market value of approximately $3,591,213. Pl. Mem. at 8, n.5. The SEC also submitted affidavits from two investors attesting to their losses. Mr. Irwin Lipp, 75, invested $143,639 between December 1999 and January 2002. Lipp Decl. ¶¶1, 3, Pl. Reply, Ex. A. His investment decision was based "almost exclusively" on the misrepresentations in the press statements and public filings." *Id.* ¶4. He lost $131,139 from his investment. *Id.* ¶3. Mr. John Malosky, 49, lost $33,849 of his $82,750 investment in Neurotech stock purchased between December 1999 and January 2002. Malosky Decl. ¶1,3, Pl. Reply, Ex. A. Curiously, defendants do not address this factor at all, let alone express any sort of remorse for the losses incurred by their investors caused by defendants' misrepresentations. Instead, they claim that "the two individuals who were hurt most by the failure of Neurotech are Bernard Artz and Lawrence Artz." Defs. Mem. at 2. Defendants have failed to provide any prove that no investors suffered substantial losses and they have further failed to even acknowledge any losses sustained by Neurotech investors. In light of the uncontroverted evidence regarding the outstanding shares of common stock and the losses sustained by innocent investors, I find that this factor also supports imposition of a civil penalty.

Based on the above, I find that the factors weigh clearly in favor of imposing civil penalties against the defendants. Moreover, as defendants violations were the result of fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement that resulted in substantial losses or created a significant risk of substantial losses, I find that third tier

9

penalties are appropriate. I turn now to a determination of the amount of the penalties, including an analysis of whether any such penalty should be reduced given a defendant's current financial circumstances.

According to defendants' papers, Bernard Artz is 86 years old and is 100 percent disabled. Defs. Mem. at 2. In addition to his purported inability to find a meaningful way to pay a penalty, he has claimed assets of $47,907 against liabilities of $112,818 for a negative net worth of ($64,911). *See id.;* Statement of Financial Condition, Dorkey Decl., Ex. B. His wife Helen Artz, however, enjoys a far different financial circumstance. Her Statement of Financial Condition shows assets of $1,546,816 against liabilities of $359,542 for a total net worth of $1,187,274. Statement of Financial Condition, Dorkey Decl., Ex. C. Included in her liabilities is $200,00 for her husband's legal fees.[4] *Id.* Defendant concludes that "[a] fully disabled World War II veteran such as Bernard Artz ought to be able to live out his final years on the more-than-modest assets he and his wife now possess." Defs. Mem. at 4. I have reviewed the arguments of the parties and relevant case law and find that a civil penalty of $10,000.00 would be appropriate under the circumstances presented here.

As to Lawrence Artz, his current and future financial situation warrants a substantial deduction from the maximum allowable penalty. His Statement of Financial Condition shows assets of $0 against liabilities of $904,550 for a negative net worth of ($904,550). Statement of Financial Condition, Dorkey Decl., Ex. H. He is 60 years old and in bad health. In his affidavit, he claims that he has unsuccessfully sought employment and that he has had to rely "on the

---

[4] It is not explained how her assets should be considered separate from her husband's assets while she shares his liabilities.

kindness of my family and friends to support me." L. Artz Aff. At ¶8. His current inability to find employment does not, however, preclude the possibility that his circumstances could change for the better. Even so, I find that the maximum penalty sought would not be appropriate. He does not present a situation in which an imposition of *no* penalty might be appropriate. *See, e.g. S.E.C. v. Credit Bancorp Ltd,* 2010 WL 3582906, at * (S.D.N.Y. Sept. 13, 2010) (declining to impose any penalty where incarceration, criminal restitution, disgorgement, and injunction had already been ordered against defendant). Given his current situation and the other remedies awarded against him, I find that a reduced penalty would serve the purpose of deterring future conduct. It is recommended that a penalty in the amount of $5,000.00 be imposed against defendant Lawrence Artz.

## CONCLUSION

For the above stated reasons, it is respectfully recommended that the following remedies be ordered:

As to defendant Bernard Artz:

1) disgorgement of proceeds in the amount of $131,414.00;
2) prejudgment interest of $32,017.42, plus any additional interest accrued to the date of entry of judgment; and
3) civil penalty in the amount of $10,000.00.

As to defendant Lawrence Artz:

1) disgorgement of proceeds in the amount of $57,129.73 ;
2) prejudgment interest of $79,846.92, plus any additional interest accrued to the date of entry of judgment; and
3) civil penalty in the amount of $5,000.00.

## OBJECTIONS

A copy of the Report and Recommendation is being sent by the Court to all parties. Any

objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days of service. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. §636 (b) (1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
February 28, 2011

     /s/ William D. Wall
WILLIAM D. WALL
United States Magistrate Judge